IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

(Tucson Division)  **CRIMINAL MINUTES**

Criminal Case No.   CR-14-1962-TUC-JAS(DTF)                              Date:  8/5/2016

Title:   USA v.  Cecil Edward Bramlett, Jr.

---

Present:                                    Hon. D THOMAS FERRARO

Defendant Present:  X      Not Present_____  Custody _____  Released  X

Deputy Clerk    Tiffany Dame                         Court Reporter  Cindy Shearman

Interpreter:   N/A

U.S. ATTY:   Carin Duryee                            Dft ATTY:    CJA Dan Cooper

---

MOTION HEARING AND
REPORT AND RECOMMENDATION

Matter comes before this Court regarding defense counsel's Motion to Suppress (docket entry #73) and Motion to determine competency (docket entry #83). Court advises parties that the Motion to Preclude Statements of Wife Testimony (docket entry #74) will be heard by District Judge Soto at the pretrial conference which is set on 8/12/2016.

Mr. Cooper presents his argument to the Court. Defense calls witness Diana Lynn Bramlett. Mrs. Bramlett is sworn and examined.

Government presents their argument to the Court.

Due to the time restraints of this matter and trial having been set for 8/16/2016, the Court dictates his report and recommendation in Open Court and the transcript will serve the same purpose as a written Order. Objections to this Court's report and recommendation will be heard by Judge Soto at the Pretrial Conference on 8/12/2016. Transcript of this Court's recommendation is attached and signed by this Court.

DATED this 5th day of August, 2016.

D. Thomas Ferraro
United States Magistrate Judge

Mtn Hrg: 1 hour 52 minutes
Time: 10:30am - 12:22pm

1   THE COURT: Okay. Thank you.

2   All right. So what I'd like to at least advise the court
3   reporter that I am going to rule on the bench. And I am going
4   to ask that a portion of my ruling be transcribed as soon as
5   practical. I do not make a habit or practice of issuing
6   recommendations or rulings in a case such as this from the
7   bench but this is a unique situation and I think time is of the
8   essence.

9   I believe that the case is set for trial on August 16th and
10  I don't want to interfere with that trial date should Judge
11  Soto disagree with any of my rulings. I want to be able to
12  have them before him in a timely manner so that the case
13  doesn't have to be continued.

14  And so, with that, I'm going to basically rule orally, have
15  it transcribed in a transcript of what I've said, which will
16  serve the same purpose as a written order. And that way the
17  parties can get this before Judge Soto quickly. He has already
18  set, as the parties know, a status conference at 2:00 o'clock
19  on the 12th, and I would anticipate that any objections or
20  appeals would be heard by Judge Soto on that date. So the
21  parties should proceed.

22  So let's begin with the suppression motion. Just give me a
23  second to get my papers together here. All right. The
24  defendant has filed a motion to suppress the search of his
25  residence and the computers alleging two grounds. The first

ground is the lack of probable cause and the second ground is the staleness of that probable cause.

Now, in order to determine if there's probable cause, the court cannot go beyond the four corners of the affidavit that was submitted in support of the search warrant. So if there's probable cause, it must be contained therein.

In this particular case, the investigators had actually downloaded from a static IP address images, three images, two video, one still, that they determined, in fact, was child pornography. They then determined that the static IP address belonged to the residence where the defendant resided. They had probable cause at that point to conduct a search of that residence to determine what, if any, computers contained that image of child pornography.

The question then becomes is how long does that probable cause extend? In this particular case, the defendants have argued that it has evaporated given the passage of seven months. The government in response has argued that the probable cause has not grown stale because of the nature of the criminal offense involved and because of the nature of the location where the evidence would be found.

The nature of the offense, child pornography, is the kind of material that generally are maintained by people who download them. Their position is that, although maybe somebody could conceivably have downloaded child pornography, that is

1  certainly not the norm, it would be an unusual setting; that
2  overwhelmingly the normal situation is for people who download
3  child pornography, they have an interest in those images and
4  they maintain them.  They argue that that is all that is
5  necessary and in part to establish that there was not
6  staleness.
7      The defense counters that that -- if that were true, that
8  would satisfy every single case for child pornography and
9  essentially staleness would not be a consideration for the
10 court.
11     Secondly, the government argues that the fact that the
12 images would have been obtained and retained on a computer
13 drive, that because of that, one would expect a long time in
14 the future that those images or residue of those images could
15 be found.  Therefore, that obviates the concerned staleness in
16 these types of cases.
17     I agree with the government.  And I also -- on both prongs,
18 actually.  I do think that there are instances wherein a person
19 could download child pornography and not keep it.  But that
20 would be isolated and it's just a fair probability.  And if a
21 person downloads child pornography, it is a fair probability
22 that they're going to retain it.
23     I also believe the second argument that they make is valid
24 as the second basis in that when one has something on a
25 computer, it is very difficult to remove it.  You almost have

1   to have it professionally done to have it wiped.  And that --
2   so I think that if a person has something on their computer,
3   that it's likely to be there over a period of time.
4       So -- now, that doesn't always mean that in every single
5   child pornography case that staleness isn't an issue but I
6   would think it would be beyond seven months, you know, sometime
7   longer than that, 12 months, 18 months.  I don't know.  I think
8   you'd have to look at every case individually to determine.  It
9   is a factor that a court has to consider.  But in this case,
10  we're talking about a passage of seven months and we're talking
11  about electronic content on a computer.
12      And, more importantly than all of this is the affidavit
13  itself.  Because the affidavit itself establishes this.  The
14  affiant gave his bona fides, established what his training and
15  experience, and then expressed opinions that would not
16  otherwise necessarily be known to a court, expert opinions on
17  page 12, paragraph E on that page.
18      He said:  Electronic files or remnants of such files can be
19  recovered months or even years after they have been downloaded
20  onto the hard drive, deleted or viewed via Internet.
21  Electronic files saved to a hard drive can be stored for years
22  with little or no cost.  Even when such files are deleted, they
23  can be recovered months or years later using readily available
24  forensic tools.
25      So the affidavit, of which I'm constrained to base my

1  ruling on, makes a finding that -- explains that these items
2  are likely to be there that they know were downloaded.  There
3  is no issue as to whether or not there was child pornography
4  that was downloaded to that static IP address at the
5  defendant's residence, that has been established beyond
6  probable cause.  It's clear and convincing that there had been
7  child pornography because the agent examined it and determined
8  it to be so.  To the extent that an agent is qualified to do
9  so.
10     Then the issue of multiple computers, the affidavit also
11 addresses that.  That was raised in the defense argument as to
12 which computer, at least to some extent.  And page 13,
13 paragraph G, addresses that particular issue with regard to
14 multiple -- multiple computers.
15     Then, as I already touched upon, the characteristics of
16 individuals involved in the distribution of child pornography,
17 the things I said would be relevant in a case involving child
18 pornography indeed are set forth in very clear detail beginning
19 on page 15 under the rubrick characteristics of persons
20 involved in the distribution and collection of child
21 pornography.  And the affiant goes on in great detail as to
22 what one would expect in these types of cases.
23     I acknowledge that in a child pornography case, it's going
24 to be very often that the staleness issue is not going to be
25 the same as it is, say, for example, in a drug case or a bank

1   robbery case or many other cases.  Each kind of criminal
2   activity has its own unique circumstances that would lend
3   itself to different levels of staleness.  Bank robbers would
4   probably try to get rid of the loot within a short period of
5   time.  Marijuana traffickers tend to sell their drugs, and
6   unless you're able to show a pattern of conduct, you wouldn't
7   expect to find it there.
8           Child pornography is a different crime, not unlike,
9   for example, the kind of records that you'd expect to find in a
10  bank fraud case or a wire fraud case, records that are
11  maintained over a course of time.  Those are different kinds of
12  issues of staleness and I think it's clearly appropriate for a
13  court, a magistrate judge, when reviewing a warrant, to
14  consider the nature of the offense that's being charged to
15  determine whether under those circumstances there is a
16  staleness problem with probable cause.  So I actually think
17  it's appropriate, not inappropriate, for the magistrate judge
18  who issued the warrant to have considered the nature of the
19  offense.
20     So if you look at the affidavit that details the
21  investigation that began on page 17 and it points out that on
22  September 17th that there was a determination that the computer
23  that was later identified to be at the defendant's address had
24  been used to download child pornography, and then they went
25  further, and later on the 17th, the next page, paragraph 25,

1  they actually downloaded the images I've previously described
2  and examined them and, in their opinion, they depicted children
3  engaged in sexually explicit conduct.
4      Then they identified the location of the address where the
5  static IP went to and they obtained a search warrant.  They
6  seized a -- they've set out in very clear detail the manner in
7  which they were going to execute the warrant, how they were
8  going to conduct this investigation, and they explained in the
9  affidavit the reason for the length of time it takes to search
10 these things.  They explained that they couldn't do it at the
11 scene, that it had to be removed.
12     Counsel has pointed out that it was a long time between the
13 time that these items were seized and the time that the
14 indictment was returned.  I don't know what occurred in that
15 period of time.  But what I do know is that the affidavit
16 explains in pretty clear detail that it takes a long time to
17 search the computers.  One gigabyte is equivalent to
18 500,000 pages of written material.  So I can understand some
19 delay in that.  I don't know that that reflects in any way on
20 the validity of the warrant.
21     The items to be seized listed -- well, first, let me back
22 up.  I think the search warrant clearly identified with
23 reasonable particularity the place to be searched, the
24 residence where the IP static address was located.  I don't
25 think it was necessary to identify who the owner of that

1   computer was and, even if they would have done so, that doesn't
2   mean that that's the person who actually was engaged in
3   trafficking or downloading the child pornography.
4       Oftentimes people living in homes who are paying the rent
5   may not be the person who was engaging in that kind of conduct.
6   They can't find that out until they do their investigation.  I
7   also, although not directly raised, find that the items to be
8   seized were supported by probable cause.
9       So the court finds that the defendant's motion to suppress
10  should be denied and I will recommend to Judge Soto that he
11  deny the motion and I make that recommendation orally here
12  today.
13      The second issue is a little more complicated, in my
14  judgment, than the issue of competency or the request for
15  competency examination.  It's complicated because the
16  examination that we do have from Dr. Menchola about five months
17  ago basically indicates, and as I recall the hearing and all of
18  the things that we discussed at that time, there is some
19  accommodation that could be made of the defendant but time is
20  of the essence.
21      More so than most cases that we see, the defendant's
22  cognitive ability is not static.  It is not necessarily
23  expected to improve.  It is expected over time, according to
24  Dr. Menchola, to degrade.  She diagnosed him with having -- he
25  has been diagnosed with having a mild cognitive disorder,

1   likely of vascular etiology, according to the doctor's report,
2   and that there's been a steady cognitive decline for the last
3   two years as the date of that examination.
4       And so it's said that he reported requiring moderate
5   supervision for managing his medications and finances, and we
6   know that his wife has been doing so and was participating but
7   doing so at a greater level today.
8       We also, as the government pointed out, see that his
9   medication can have an impact and has had significant impact on
10  his cognitive ability.  Indeed, during the examination by
11  Dr. Menchola, when he seemed to be having difficulty, he was
12  allowed to have a snack, which seemed to improve significantly,
13  according to the doctor, after eating.  According to the
14  doctor, his demeanor was significantly different.
15      So these are things that exist.  They're not malingering.
16  I didn't intend to suggest that he was malingering.  They do
17  exist.  The doctor at that time found that he had -- that he
18  had average mental manipulation information ability.  She found
19  that he could recall complex visual information and was mildly
20  impaired after a long delay with average recognition.  His
21  auditory attention span and working memory was average.  His
22  fluency, that is, the ability to maintain verbal responses were
23  average from a phonetic and semantic verbal fluency and was low
24  average for nonverbal fluency.  His language functions were
25  high -- was a -- high average.  He performed within the normal

1  limits for malingering, so she didn't find malingering as was
2  suggested by Mr. Cooper.
3      He denied at that time having any problems understanding
4  his lawyer but did say that his lawyer had to repeat
5  information two or three times because it's like another
6  language.  Well, he's kind of saying he's talking like a lawyer
7  probably.  We all kind of talk like -- in a different language
8  to some people.
9      Then she went through her findings and her opinions, and
10 specifically then she went on to her conclusions and her
11 opinions and in paragraph 4 she indicates that if his cognitive
12 impairment is vascular in nature, his cognitive status might
13 remain relatively stable for some time if his vascular risk
14 factors, that is hypertension and diabetes, are well
15 controlled.  Well, we know that his diabetes hasn't been well
16 controlled because he had an instance where he had used too
17 much insulin and had to be hospitalized.
18     When I go through all these, I have to balance where we are
19 in this case.  I have a doctor's opinion that at the time of
20 that report, the defendant was competent but would need some
21 accommodation.  Now we're five months later and the issue is
22 has he -- has his illness progressed to such a degree that he
23 needs to be tested to determine if he's competent?
24     If I grant that motion, then it's necessarily going to
25 cause additional delay to get the defendant to trial and we

1    know with this medical record to a reasonable certainty that
2    his dementia will progress.  So when I balance that with where
3    we are today, and the doctor's opinion that it would only
4    progress over a short period of time, and I see that he's had
5    problems with his medications, it seems to me that it's equally
6    plausible that his mental state could be the result of not
7    maintaining his medication.
8         His wife is now in charge of that, and that has happened
9    after Dr. Menchola -- we don't know exactly when he overdosed
10   so I don't know exactly how many months that she has been
11   maintaining it.  But it seems to me that, along with the
12   additional medication that his wife wanted him to take seems to
13   be a reasonable approach here.
14        I also agree with the government's analysis on how to
15   handle this.  I think if we -- if Judge Soto were to begin the
16   trial and in the course of the trial it became evident that the
17   defendant was not able to proceed, or if at the conclusion of
18   the trial it was determined that he wasn't competent, that
19   would -- that would go -- it's not impossible to do that.  And
20   it seems to me, as I consider this, when I decide whether I
21   should exercise my discretion to delay the case versus going to
22   trial and undoing something, it seems to me that the latter is
23   a better choice because the former almost guarantees that the
24   more delay, the more difficulty it will be for him to assist
25   his counsel, even ever so slightly.

1   With regard to the testimony, I think we've covered that in
2   past hearings but it was briefly raised, I still see the same
3   occurring.  The fact that the defendant has a disability is not
4   something that a -- I have found the jurors hold against a
5   person.  A person who has disabilities, I find that most
6   reasonable people, certainly people who would be seated on a
7   jury in federal court, would understand and would accommodate
8   and would not hold against a defendant and certainly I'm sure
9   Judge Soto would be willing to instruct them not to if it was
10  even needed.
11      So as I go through the analysis of this, what I'm faced
12  with is the defendant's spouse, who lives with him and sees his
13  inability or the progression of the dementia, and then I have
14  to decide, well, is that going to warrant delaying the trial
15  date to have a doctor analyze it?  And I don't even know at
16  this point in time that the deterioration could not be
17  accommodated at trial by giving counsel more time to discuss
18  things with the client.
19      It just seems to me that I see no evidence that would
20  suggest that that isn't the best approach.  Because the other
21  approach is very problematic.  If this has progressed as
22  rapidly as is suggested here, any delay would be devastating.
23      So I'm going to deny the defendant's request to be examined
24  at this time.  As I indicated earlier when I began this, I know
25  either -- however I rule, and I really wasn't sure how I was

1   going to rule, so I contacted Judge Soto to make sure that he
2   could hear the objections by either party on the 12th, that's
3   why I'm ruling orally on this.  He could very well disagree
4   with me.  I mean, this last issue is the most troubling to me
5   and, you know, maybe I'm wrong and that's why I like my job
6   'cause I have somebody who can tell me and fix it.
7       So that's my ruling and I've put this -- I'm going to
8   conclude now and then I'll give you a chance to speak but I
9   want to conclude so that the record is one solid ruling so it
10  will be easier for Judge Soto to read.
11      So, in conclusion, the court denies the defendant's motion
12  to suppress for the reasons I stated and denies the defendant's
13  motion for competency exam as I've stated.
14      All right.  That concludes my ruling.
15      Mr. Cooper, you want to say anything?
16          MR. COOPER:  Yeah, I make a request that the court
17  order that a written transcript of Mrs. Bramlett's testimony be
18  provided.
19          THE COURT:  Okay.  Okay.  That's fine.  I will ask --
20  you don't need that until -- well, I'm not sure I have to order
21  I think you have to put in a request is the way that works.
22          MR. COOPER:  I don't need it but I'd like Judge Soto
23  to be able to have it and for all of us to be able to have it
24  by the 12th if that's possible.
25          THE COURT:  Well, why don't we discuss that when the

```
 1   court concludes because I'm not sure the actual administrative
 2   mechanism to acquire that.  I know that you want it and I'm
 3   sure that it will be able to be done but we don't have to
 4   discuss that on the record.
 5        Anything further?
 6             MR. COOPER:  No, Your Honor.
 7             THE COURT:  Anything from the government?
 8             MS. DURYEE:  No, Your Honor.
 9             THE COURT:  Okay.  This concludes the court's hearing
10   today.
11        (Whereupon, the matter was concluded at 12:21 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```